**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ROBIN COOK and JENNIFER JOHNSON, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

MEDIAOCEAN LLC, INNOVID, LLC, FLASHTALKING, INC., 4C INSIGHTS, INC. and TV SQUARED, INC.,

Defendants.

Case No.

**Class Action Complaint**

**Demand for Jury Trial Enclosed**

## I. INTRODUCTION

1. This case arises from Mediaocean LLC's ("Mediaocean" or "Defendant") interception and use of Plaintiffs' private information in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631.

2. Mediaocean is an advertising technology company and registered data broker in California. It installed or used a series of highly invasive digital tracking technologies on webmd.com and nutrafol.com, which it then used to collect highly personal data regarding thousands visitors to webmd.com and nutrafol.com without their consent. As a result, Mediaocean violated restrictions on wiretapping under state and federal law and invaded users' privacy.

3. Plaintiffs Robin Cook and Jennifer Johnson are victims of Mediaocean's misconduct. Mediaocean collected and used their private information without their consent. Plaintiffs bring this case as a class action, seeking damages and equitable relief on behalf of themselves and all others similarly situated.

## II. PARTIES

4. Plaintiff Robin Cook is, and at all times mentioned herein was, an individual citizen of the state of California, where she intends to remain. Plaintiff Cook used the website nutrafol.com, where her personal information was collected by Defendants.

5. Plaintiff Jennifer Johnson is, and at all times mentioned herein was, an individual citizen of the state of California, where she intends to remain. Plaintiff Johnson used the website webmd.com, where her personal information was collected by Defendants.

6. Defendant Mediaocean LLC, d/b/a Mediaocean is headquartered in New York at 120 Broadway, FL 8 New York, NY, 10004. Mediaocean is a privately held advertising technology company that provides omnichannel (digital, social, TV, in-store) marketing solutions for brands and agencies.

7. Defendant Innovid, LLC is headquartered in New York at 120 Broadway, FL 8 New York, NY, 10004.

8. Defendant Flashtalking, Inc. is headquartered in New York at 120 Broadway, FL 8 New York, NY, 10004.

9. Defendant 4C Insights, Inc. is headquartered in New York at 120 Broadway, FL 8 New York, NY, 10004.

10. Defendant TV Squared, Inc. is headquartered in New York at 120 Broadway, FL 8 New York, NY, 10004.

11. Mediaocean has acquired and operates Innovid LLC ("Innovid"), Flashtalking, Inc. ("Flashtalking"), TV Squared Inc. ("TV Squared"), 4C Insights, Inc. ("4C"), along with 4C's brand "Scope," and Prisma. Through those acquisitions, Mediaocean gained legal control over each respective company.

12. For example, 4C's Privacy Policy of data licensing services ("4C Policy") directs users to a "main Privacy Policy" hosted on Mediaocean's website, and its official contact points use Mediaocean domains (e.g., "To exercise your privacy rights: ccpa@mediaocean.com.").

*Privacy policy: Data licensing services*, MEDIAOCEAN (July 1, 2024), https://www.mediaocean.com/privacy-policy-closedecosystems.

13. At the same time, the Innovid Policy identifies 4C and Flashtalking as part of Innovid and covers their products. *Privacy Policy*, INNOVID (July 2, 2026), https://www.innovid.com/privacy-policy.

14. Taken together, these cross-references demonstrate that Innovid, through 4C and Flashtalking, is operating under Mediaocean's framework, consistent with Innovid functioning as an instrumentality of Mediaocean.

15. In addition, 4C describes itself on its LinkedIn page as "4C Insights (part of Innovid by Mediaocean)," demonstrating a high degree of operational integration. *4C Insights (part of Innovid by Mediaocean)*, LINKEDIN, https://www.linkedin.com/company/4c-insights/.

16. Moreover, Mediaocean registered as a data broker in California in 2024 through 4C in the following manner: "4C Insights Inc. (Media Ocean)." Therefore, 4C has acknowledged that it is incorporated within Innovid, while simultaneously acting as the entity through which Mediaocean is listed as a data broker. Thus, there is no meaningful segmentation between the entities, as they collectively serve Mediaocean's business purposes.

17. Mediaocean, LLC, Innovid, LLC, and 4C Insights, Inc. all list the same address in their respective privacy policies: 120 Broadway, New York, NY 10004.

18. Mediaocean's merger agreement with Innovid provides that Innovid became a Mediaocean-owned subsidiary following the merger and provides Mediaocean with legal control over Innovid's governance, including board and organizational matters. *See Agreement and Plan of Merger* §§ 2.1, 2.4, 2.5(a)–(b), 2.6(a) (Nov. 21, 2024), https://www.sec.gov/Archives/edgar/data/1835378/000121390024101038/ea022210401ex2-1_innovid.htm.

19. Therefore, Innovid, Flashtalking, TV Squared, and 4C are all alter-egos of Mediaocean. Unless otherwise stated, this complaint refers to these companies collectively as "Mediaocean."

## III. JURISDICTION AND VENUE

20. This Court has personal jurisdiction over Defendants because their principal place of business is in New York.

21. The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because Defendants are unincorporated associations under 28 U.S.C. § 1332(d)(10) with their principal place of business located in New York, at least one member of the class (including each Plaintiff) is a citizen of a different state than Defendants, the amount in controversy exceeds $5,000,000, and none of the exceptions to that subsection apply.

22. Venue is proper in this Court because Defendants' principal place of business is located in this District and a substantial portion of the events and omissions giving rise to the claim occurred in this District. *See* 28 U.S.C. § 1391(b).

## IV. FACTUAL ALLEGATIONS

### A. CIPA applies to the use of digital tracking technologies.

23. CIPA was initially passed in 1967 for the purpose of protecting the privacy rights of California residents. Indeed, CIPA's preamble lays out the statute's purpose clearly: "the legislature by thus chapter intends to protect the right of privacy of the people of this state." Cal. Penal Code § 630.

24. The California legislature passed CIPA in recognition of rapidly developing technology designed to eavesdrop on private communications. The legislature acted to address the "serious threat to the free exercise of personal liberties" that such technology created, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

25. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *78 (N.D. Cal. Sep. 26, 2013); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d

1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 U.S. App. LEXIS 14951, at *3 (9th Cir. 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 U.S. Dist. LEXIS 107918, at *60–61 (N.D. Cal. 2016).

26. In this case, Defendant violated Sections 631(a) and 638.51 of CIPA.

27. Individuals may bring an action against the violator of any provision of CIPA—including Cal. Penal Code §§ 631(a) & 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. Defendant collects private information via its digital tracking technology.**

28. In connection with its advertising, marketing, and analytics businesses, Mediaocean collects a variety of identifiers from end-users who visit websites with Mediaocean tracking technology, including:

- Identifiers: IP addresses, cookie identifiers (such as the Flashtalking GUID and _D9J cookies and the Innovid uuid cookie), mobile advertising identifiers (e.g., Apple IDFA and Google AdID), CTV advertising identifiers and other device or browser-based identifiers.
- Where ads include forms, Mediaocean (through Innovid) collects information provided by the users, including Personal Identifiable Information ("PII"), and provide this PII to the Innovid customer on whose behalf the ad was served.
- Browser and device information, including operating system, device type, browser type and version and other technical attributes.
- Extensive user activity data across customers' media properties and advertising services, such as pages visited, advertisements viewed, impressions, clicks and other

website actions, mouse movements, viewing duration, pages and sections accessed, URL and referral URL and other

- Non-precise geolocation information, such as country, state, city, and ZIP or postal code, derived from IP addresses.

29. Mediaocean has further stated to its customers that it receives and collects PII and other valuable data points of end users from third-party advertisers, agencies, and other customers, depending on the services provided. This PII and related data points include, but are not limited to, IP addresses, cookie and/or device identifiers, names, email addresses, mailing addresses, and phone numbers.

30. Mediaocean prides itself in its identity resolution solution. Through Innovid, Mediaocean "collects available data through the platform's ad server and proprietary SDK, which is installed in over 25 connected device types. Those signals are then matched to Innovid Key's Household Graph. Subsequently, . . . external 'key' are then plugged into the solution. These include first-party publisher IDs, clean rooms, and external ID partners. The result is identity resolution at a scale that allows marketers to reach the right people with the right message while ensuring data transparency and ownership." *Innovid Launches Innovid Key To Address Growing Data Privacy Concerns*, INNOVID (Sept. 15, 2021), https://www.innovid.com/about-us/news/innovid-launches-innovid-key-to-address-growing-data-privacy-and-identity-concerns.

31. In preparation for the cookieless era in the ad-tech industry, Mediaocean, through its Flashtalking brand, announced a partnership with Experian, a leading data broker in the identity and audience space. This partnership enables brands and agencies that are Mediaocean's customers to access Experian's data, with "more than 2,400 syndicated audiences available for activation within the Flashtalking platform and its Social Ads Manager." *Inside the Experian and Mediaocean partnership*, EXPERIAN (Mar. 28, 2024), https://www.experian.com/blogs/marketing-forward/experian-and-mediaocean-partnership/page/44/.

32. Mediaocean has further expanded these capabilities through a partnership with LiveRamp, integrating LiveRamp's RampID as a persistent, authenticated identifier that enhances Mediaocean's ability to track advertising performance, manage reach and frequency, and measure outcomes across devices and channels without reliance on third-party cookies. *See Flashtalking by Mediaocean Integrate's LiveRamp's RampID to Power Personalization and Performance without Cookies*, INNOVID (Jan. 7, 2025), https://www.innovid.com/about-us/news/flashtalking-integrates-liverampsrampid-to-power-personalization-and-performance-without-cookies.

33. Mediaocean accomplishes its data collection through the use of various technologies, including:

- "Cookies", which are small text files stored on a browser or in device memory that help to recognize that the same device has been seen before, and where, in the context of a Customer's ad campaign;
- "Web beacons" (also known as "tracking pixels"), which are electronic images that help perform a variety of functions, including delivering cookies, counting visits, and understanding usage;
- Software development kits ("SDKs"), which are tools that help application developers to enable advertising in applications;
- "Macros", which are dynamic placeholders in ad tags and URLs that are automatically replaced with information when an ad is served;
- "Server to Server Connections", which are a connection enabling two or more servers to communicate directly with each other to synchronize data;
- "Ftrack", which is a technology proprietary to Mediaocean and utilized by Innovid and Flashtalking in their ad delivery and analytics products that uses probabilistic device recognition to derive an identifier for a device.

34. Mediaocean uses these tracking technologies deployed through its customers' digital properties and advertising partner integrations to recognize browsers and devices,

measure ad and content interactions, optimize billing, and enable interest-based advertising. When a customer integrates Mediaocean's technology (such as Mediaocean's Ftrack, tracking pixels, and cookies) into its website or application, Mediaocean can set identifiers in a user's browser or access identifiers already present.

35. Mediaocean deploys persistent browser cookies across its advertising network. These cookies remain stored on a user's device after a browser session ends, allowing Mediaocean to recognize returning users across multiple sessions and across different websites. These cookies are refreshed each time a user visits any website running Mediaocean's tracking pixels—effectively creating an indefinite tracking mechanism for regular internet users.

36. Mediaocean's core cookies include the following:

- **flashtalkingad1 (GUID)** – a third party, persistent (up to 2 years) unique browser identifier used to recognize users across sites that deploy Mediaocean technology, facilitate audience segmentation, enable interest-based advertising, and support ad delivery continuity;
- **_pk_uid (Innovid)** - a third party, persistent (up to 2 years) unique browser identifier that allows the InnovidXP tracker to identify individual users, establish lag between response activities, and confirm the continuity of campaigns being responded to.
- **_pk_id or _tq_id (Innovid)** - a first party, persistent (up to 2 years) unique browser identifier that aids reporting of site visits and actions for analytical reporting to Innovid.
- **_D9J (Flashtalking)** - a unique browser cookie that lasts as long as the browsing session is active. This cookie carries out information about how the user uses the website and what interactions it had with any advertising materials before landing on the certain website.
- **uuid (Innovid)** – a third party, persistent (up to three months) unique browser identifier used in connection with cross-device recognition, attribution, and measurement, which is generally associated with video advertising.

37. Through these and other tracking technologies, Mediaocean learns in an unauthorized manner the contents of communications passing through the internet, such as URLs and search terms.

38. Mediaocean has installed and used its tracking technology on a variety of websites, including nutrafol.com and webmd.com.

39. Nutrafol is an online supplement provider focused on skin and hair supplements that are marketed and described as targeting specific conditions related to hormonal changes, stress, aging, and hormonal imbalances, including postpartum-related changes, in both women and men. Nutrafol sells its products in the form of capsules, topical treatments, and serums, and features a large catalogue of male and female testimonials describing the products' effects on hair and skin health. The company emphasizes its use of expert safety assessments and the conduct of rigorous clinical trials to support claims of visible results from its products.

40. The following is an image of the nutrafol.com homepage:



41. When a user clicks on Nutrafol's products menu, it brings up the following menu:




42. When a user then clicks on the "Postpartum" product, it brings up the following page:




43. Following that sequence, and as seen in the following image, an embedded Mediaocean script triggers a request to Flashtalking servers instantaneously while the

communications are in transit, and collects persistent identifiers and health-related data, such as URLs and search terms containing the content of users' communications with the nutrafol website:



Request

Pretty Raw Hex Analysis

```
GET /container/29425;146324;16779;iframe/?ftXRef=undefined&ftXValue=undefined&ftXNumItems=undefined&
ftXCurrency=USD&U1=undefined&ft_referrer=
https%3A//nutrafol.com/nutrafol-postpartum-for-women/%3F~ftXRef%3Dundefined%26ftXValue%3Dundefined%26ftXN
umItems%3Dundefined%26ftXCurrency%3DUSD%26U1%3Dundefined%26&ns=&cb=998068.7321548669 HTTP/1.1
Host: servedby.flashtalking.com
Cookie: _D9J=[redacted]; flashtalkingad1=
"GUID=[redacted]"
Sec-Ch-Ua: "Google Chrome";v="143", "Chromium";v="143", "Not A(Brand";v="24"
Sec-Ch-Ua-Mobile: ?0
Sec-Ch-Ua-Platform: "macOS"
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/143.0.0.0 Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,applicat
ion/signed-exchange;v=b3;q=0.7
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: navigate
Sec-Fetch-User: ?1
Sec-Fetch-Dest: iframe
Sec-Fetch-Storage-Access: active
Referer: https://nutrafol.com/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Priority: u=0, i
Connection: keep-alive
```

44. The following is an image from webmd.com:



45. If a user searches through the Pill Identifier webpage on webmd.com, the following page appears:




46. Following that sequence, and as seen in the following image, an embedded Mediaocean script triggers a request to Flashtalking servers while the communications are in transit, which carries persistent identifiers and health-related data, such as URLs and search terms containing the content of users' communications with the WebMD website:

```
GET /imp/1/271670;9348398;201;js;DV360;DV360FY25CCBEHCCTInMarketSADSKBAN300x250NANAPhotoshopDCNA/?ftx=&fty=&ftadz=&ftscw=&
ft_custom=&ftOBA=1&ft_ifb=1&ft_domain=www.webmd.com&ft_agentEnv=0&ft_referrer=
https%3A%2F%2Fwww.webmd.com%2Fpill-identification%2Fsearch-results&gdpr=&gdpr_consent=&us_privacy=${US_PRIVACY}&bundle_id=&
ft_partnerimpid=ABAjH0gToorCm-m54WEj6Zuu1Qvw&pub_id=1&site_url=https://www.webmd.com/pill-identification/search-results&
sup_platform=1&cachebuster=521328.7296402721 HTTP/1.1
Host: servedby.flashtalking.com
Cookie: _D9J=2e5242825beb47dbb66c3e14311b625e; flashtalkingad1="GUID=6700423E3E13E4|segment=(apm3,apm8,apm5,apna,apm0)"
Sec-Ch-Ua-Platform: "macOS"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 14.7; rv:134.0) Gecko/20100101 Firefox/134.0
Sec-Ch-Ua: "Chromium";v="148", "Google Chrome";v="148", "Not/A)Brand";v="99"
Sec-Ch-Ua-Mobile: ?0
Accept: */*
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: script
Sec-Fetch-Storage-Access: active
Referer: https://googleads.g.doubleclick.net/
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Priority: u=1
Connection: keep-alive
```

47. Through the use of the tracking technologies described above, Mediaocean read, attempted to read, or learned the browsing activity, search terms, and page URLs that website users were communicating to website operators.

48. Browsing activity, search terms, and page URLs constitute the contents or meaning of a communication. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1051 (S.D. Cal. 2023) (holding that "information about particular activity conducted and search terms used on an

app qualify as the 'contents' of communication under CIPA"); *see also Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1091 (N.D. Cal. 2022) (same). The Ninth Circuit has similarly held that URLs and cookies qualify as "contents." *In re Facebook Internet Tracking*, 956 F.3d 589, 606–07 (9th Cir. 2020).

49. Mediaocean eavesdropped on those communications while they were in transit, as the tracking technologies transmitted the information in real-time.

50. Mediaocean acted willfully, as the very purpose of its tracking technologies is to read or learn the contents of communications and sell them for profit.

51. Mediaocean did not obtain consent from Plaintiffs or the Class to read, attempt to read, or learn the contents of their communications.

52. As such, Mediaocean willfully collects precisely the data that has been found to constitute "contents" of the communication—such as page URLs, browsing activity, products viewed, and shopping cart contents—and then reads and learns the "contents" through cookies and other persistent identifiers it has enabled without consent.

53. Mediaocean uses or attempts to use the information it collects via the tracking technology described above for its own benefit by offering it as a business service to its customers.

54. Specifically, Mediaocean uses or attempts to use this information in connection with targeted advertising, marketing, and business analytics.

55. Mediaocean did not obtain consent from Plaintiffs or the Class to use or attempt to use their information in this or any way.

56. Through the use of these and other tracking technologies, Defendant violated 18 U.S.C. § 2511(1), *et seq.*, Cal. Penal Code § 631(a) and invaded Plaintiffs' and class members privacy.

### C. Plaintiffs have been injured by Mediaocean's unauthorized interception of users' personal information.

#### 1. Plaintiff Cook

57. Plaintiff Cook accessed nutrafol.com on her personal devices within the last year.

58. At all relevant times, Plaintiff Cook resided in California and was over 18 years of age.

59. Plaintiff Cooked used nutrafol.com to search for information regarding medical issues, including for hair loss vitamins.

60. When Plaintiff Cook input information regarding those medical issues into nutrafol.com, Mediaocean intercepted the contents of her communications.

61. Plaintiff Cook never consented to the interception of her data, nor did Plaintiff ever create an account, or log into an account, to view this website.

62. Each time Defendant used its tracking technology to read or attempt to read, learn, or utilize the contents of Plaintiff's communication, Defendant violated Plaintiff's rights under 18 U.S.C. § 2511(1), *et seq.* and Cal. Penal Code § 631(a).

63. The collection of Plaintiff Cook's data through Mediaocean's use of tracking software constitutes an invasion of privacy.

64. Plaintiff Cook strongly objects to Mediaocean's collection of her data. She does not wish for her information to be used in this way, especially without her permission. Defendant's conduct has caused her to suffer significant distress and dismay.

65. Plaintiff Cook wishes to use nutrafol.com again, so long as she can be assured that her communication content, persistent identifiers, and other information will not be captured by Mediaocean.

#### 2. Plaintiff Johnson

66. Plaintiff Johnson accessed webmd.com within the past year from her personal device.

67. At all relevant times, Plaintiff Johnson resided in California and was over 18 years of age.

68. Plaintiff Johnson used webmd.com to search for information regarding medical issues, including to check her symptoms.

69. When Plaintiff Johnson input information regarding those medical symptoms into webmd.com, Mediaocean intercepted the content of her communications in real time.

70. Plaintiff Johnson never consented to the collection of her data, nor did Plaintiff ever create an account, or log into an account, to view this website.

71. Each time Mediaocean used its tracking technology to read or attempt to read, learn, or utilize the contents of Plaintiff's communication, Mediaocean violated Plaintiff's rights under 18 U.S.C. § 2511(1), *et seq.* and Cal. Penal Code § 631(a).

72. The collection of Plaintiff Johnson's data through Mediaocean's use of tracking software constitutes an invasion of privacy.

73. Plaintiff Johnson strongly objects to Mediaocean's use of her data. She does not wish for her information to be used in this way, especially without her permission. Mediaocean conduct has caused her to suffer significant distress and dismay.

74. Plaintiff Johnson wishes to use webmd.com again, so long as she can be assured that her communication content, persistent identifiers, and other information will not be captured by Mediaocean

## V. CLASS ACTION ALLEGATIONS

75. Plaintiffs bring this lawsuit pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of the following class (the "Nationwide Class"):

> All persons in the United States who visited webmd.com and nutrafol.com and had the contents of their communication read, learned, or utilized via Mediaocean's tracking software without registering as users of webmd.com or nutrafol.com.

76. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs also seek to represent the following California Subclass (the "California Class"):

All persons in California who visited webmd.com and nutrafol.com and had the contents of their communication read, learned, or utilized via Mediaocean's tracking software without registering as users of webmd.com or nutrafol.com.

77. Excluded from the Class and Subclass are: (a) Mediaocean and its employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

78. *Numerosity.* The Class is so numerous that individual joinder is impracticable. Every year, there are thousands of unique visitors from California and many more nationwide to websites using Mediaocean's tracking technology—including webmd.com and nutrafol.com. On information and belief, Mediaocean collected and used the personally identifiable information of all those users. The Class therefore contains thousands of Class members—far too many for individual joinder.

79. *Typicality.* Plaintiffs' claims are typical of the Class they seek to represent. Plaintiffs, like all Class members, had their content communication and other persistent identifiers collected by Mediaocean without their consent. Plaintiffs' claims arise out of the same conduct and are based on the same legal theories as those of any absent class members.

80. *Adequacy of Class Representative.* Plaintiffs will fairly and adequately protect the interests of the Class. They are aware of their duties to absent class members and are determined to faithfully discharge their responsibility. Plaintiffs' interests are aligned with and not antagonistic to the interests of the Class.

81. *Adequacy of Counsel.* In addition, Plaintiffs have retained competent counsel with considerable experience in privacy class actions and other complex litigation. Plaintiffs' counsel has done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class.

82. *Commonality and Predominance.* This case presents numerous questions of law and fact with answers common to the Class that predominate over questions affecting only individual Class members. Those common questions include:

- Whether Defendant violated 18 U.S.C. § 2511(1), *et seq.*;
- Whether Defendant violated § 631(a) of the California Penal Code;
- Whether Defendant intercepted the content of Plaintiffs' and Class Members' communication while in transit;
- Whether Defendant read, or attempted to read, learn, or utilize Plaintiffs' communication content;
- Whether Defendant obtained prior consent from Plaintiffs and the Class;
- Whether Defendant's acts and omissions alleged herein constitute an invasion of privacy;
- Whether Class members are entitled to compensatory or statutory damages, punitive damages, and equitable relief as a result of Defendant's conduct.

83. *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all Class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual Class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

84. *Injunctive Relief*. Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

85. *Particular Issues*. Plaintiffs' claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

### Count 1: Invasion of Privacy

### (On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass.

86. Plaintiffs reassert and incorporate by reference paragraphs 1–85 as if fully set forth herein.

87. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

88. By conducting such widespread surveillance, Defendants intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

89. Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, health and other data would remain confidential.

90. Plaintiffs and Class Members did not and could not authorize Mediaocean to intercept data on every aspect of their lives and activities.

91. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

92. Defendants' amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

93. In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example. allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

94. Accordingly, Plaintiffs and Class Members are entitled to injunctive relief and damages in an amount to be determined at trial.

**Count 2: Violations of the Electronic Communications Privacy Act**

**18 U.S.C. § 2511(1), *et seq.***

**(On Behalf of Plaintiffs and the Nationwide Class)**

95. Plaintiffs reassert and incorporate by reference paragraphs 1–85 as if fully set forth herein.

96. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

97. ECPA protects both sending and the receipt of communications.

98. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

99. The transmission of Plaintiffs' website page visits, search terms, and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

100. The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

101. ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

102. ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

103. ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." 18 U.S.C. § 2510(5).

104. The computer code and software that Defendant installed or used on webmd.com and nutrafol.com are "devices" within the meaning of ECPA.

105. Plaintiff and Class Members' interactions with webmd.com and nutrafol.com are electronic communications under the ECPA.

106. Defendants intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their health, shopping habits, consumption of media, and more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

107. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

108. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

109. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090–91 (N.D. Cal. 2025); *Gilligan v. Experian Data Corp.*, 2026 U.S. Dist. LEXIS 1907, *9 (N.D. Cal. Jan. 6, 2026).

110. Defendants were not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

111. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

112. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

113. As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiffs seek statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

**Count 3: Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631(a)**

114. Plaintiffs reassert and incorporate by reference paragraphs 1–85 as if fully set forth herein.

115. Plaintiffs bring this claim individually and on behalf of the proposed California Subclass.

116. Section 631(a) of CIPA provides that:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, . . . [1] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable . . . [2] or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . is punishable [by fine or imprisonment].

Cal. Penal Code § 631(a).

117. Defendants are persons within the meaning of CIPA.

118. Via its tracking technology, Defendants willfully read, attempted to read, or learned the contents of communications Plaintiffs and the Class sent to nutrafol.com and webmd.com.

119. Defendants read, attempted to read, or learned the contents of those communications while they were in transit or passing over any wire, line, or cable.

120. Defendants did not obtain consent from Plaintiffs and the Class to read, attempt to read, or learn the contents of their communications. Defendant acted in an unauthorized manner.

121. Defendants used or attempted to use the information it obtained from Plaintiffs' and the Class's communications in connection with business activities, such as targeted advertising, marketing, and analytics.

122. Defendants did not obtain consent to use the information it obtained from Plaintiffs' and the Class.

123. Therefore, Defendants violated Section 631(a).

124. Plaintiffs and the Class have been injured by Defendant's violations of Section 631(a).

125. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class are entitled to statutory damages and injunctive relief.

**PRAYER FOR RELIEF**

126. Plaintiffs, individually and on behalf of all others similarly situated, hereby request that the Court:

- Certify this case as a class action;
- Appoint Plaintiffs as Class representatives and appoint Plaintiffs' counsel to represent the Class;
- Find that Defendant's actions, as described herein, constitute violations of the Electronic Communications Privacy Act and the California Invasion of Privacy Act.

- Award compensatory, punitive, and statutory damages in amounts to be determined by the Court or jury;
- Award punitive damages in an amount to be determined at trial;
- Award reasonable attorneys' fees and reimbursement of litigation expenses;
- Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;
- Enter judgment in favor of Plaintiffs and the Class;
- Enjoin Defendant's ongoing misconduct, enter any equitable relief it deems appropriate, and awards restitution in an amount sufficient to disgorge Defendant's ill-gotten gains; and
- Enter any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

127. Plaintiffs demand a jury trial on all applicable claims.

Dated: August 27, 2026

Respectfully submitted,

By: /s/ Stephen DeNittis

Stephen DeNittis, Esq.
DeNITTIS OSEFCHEN PRINCE, P.C.
315 Madison, Ave.
3rd Floor
New York, NY 10017

Matthew R. Wilson (*pro hac vice* to be filed)
Jared W. Connors (*pro hac vice* to be filed)
MEYER WILSON WERNING CO., LPA
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066
Email: mwilson@meyerwilson.com
jconnors@meyerwilson.com

Brian Levin (*pro hac vice* to be filed)
LEVIN LAW, P.A.
2665 South Bayshore Drive, PH2b
Miami, FL 33133
Telephone: (305) 402-9050
Facsimile: (305) 676-4443
Email: brian@levinlawpa.com

*Counsel for Plaintiff and the Proposed Class*